598 A.2d 187

**Richard Junior WHITE and Adrian Raymond White**

v.

**STATE of Maryland.**

**No. 149, Sept. Term, 1990.**

Court of Appeals of Maryland.

Nov. 12, 1991.

Mark Colvin, Asst. Public Defender (Stephen E. Harris, Public Defender, both on brief), Baltimore, for petitioners.

Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW and KARWACKI, JJ.

CHASANOW, Judge.

Richard Junior White and his cousin, Adrian Raymond White (the Whites), were charged with kidnapping a woman in Anne Arundel County, raping her in a van, and robbing her of four dollars she had in her purse. At the trial, the Whites wanted to put on the witness stand a man who they said would testify that the victim had previously offered or exchanged sex for drugs. The trial court refused, saying that such testimony would violate Maryland's rape shield statute, Maryland Code (1957, 1987 Repl.Vol.), Article 27, § 461A. The statute reads:

> "(a) *Evidence relating to victim's chastity.*—Evidence relating to a victim's reputation for chastity and opinion evidence relating to a victim's chastity are not admissible in any prosecution for commission of a rape or sexual offense in the first or second degree. Evidence of specific instances of the victim's prior sexual conduct may be admitted only if the judge finds the evidence is relevant

and is material to a fact in issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value, and if the evidence is:

(1) Evidence of the victim's past sexual conduct with the defendant; or

(2) Evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, disease, or trauma; or

(3) Evidence which supports a claim that the victim has an ulterior motive in accusing the defendant of the crime; or

(4) Evidence offered for the purpose of impeachment when the prosecutor puts the victim's prior sexual conduct in issue.

(b) *In camera hearing.*—Any evidence described in subsection (a) of this section, may not be referred to in any statements to a jury nor introduced at trial without the court holding a prior in camera hearing to determine the admissibility of the evidence. If new information is discovered during the course of the trial that may make the evidence described in subsection (a) admissible, the court may order an in camera hearing to determine the admissibility of the proposed evidence under subsection (a)."

In an unreported opinion, the Court of Special Appeals affirmed the Whites' convictions. We granted the Whites' petition for certiorari to consider whether the trial court correctly applied the rape shield law in excluding the proffered testimony. We believe that the trial court properly exercised its discretion and, therefore, affirm the judgments below.

At trial, the victim, whom we shall identify only as "Nicole," testified that on the evening of December 19, 1988 she was at the home she shared with her fiancé and their son. At about midnight, when the rest of the household was asleep, she went to a local phone booth at the side of the street to make some calls. While she was at the phone, a white van drove by, and one of its occupants asked her if

she knew where any crack cocaine could be found. Nicole told them she did not "do" drugs, and the van drove off.

A short distance away, the van made a U-turn and came back. This time, according to Nicole, the men jumped out and pulled her into the vehicle so harshly that she dropped the beer she was drinking, lost one of her shoes, and urinated in her pants. The pair told her they would not kill her if she kept quiet. After the van stopped, the men, for one to two hours, repeatedly raped her on the vehicle's back seat. The men also took four dollars they found in her purse and released her near the spot where they had grabbed her. Nicole returned home and banged on the door. She told her fiancé that she had been raped by two men. Police later found Nicole's shoe in the street near the phone.

The Whites admit that they were in a van with Nicole that night, but their version of what happened differs dramatically from hers. Richard White testified that he picked up his cousin, Adrian, and drove to the Pioneer City area in Anne Arundel County to buy a video game from a friend of Adrian's. He dropped Adrian off at the friend's house and drove away, planning to return to his home in Baltimore City.

According to Richard, Nicole, whom he did not know, approached the van and asked for a ride to Freetown, another county neighborhood a few miles to the east. After he told her he couldn't take her there, Nicole asked to be driven to Meade Village, a community next to Pioneer City; Richard agreed. As they approached Meade Village, Nicole asked Richard for some cocaine. She then ducked down in the back of the van, telling Richard that her boyfriend's brother lived in the area. Nicole then made "suggestive moves" and offered her body to Richard if he would buy her some cocaine. He declined the offer, saying he had a fiancée, two children, and a fear of AIDS.

Eventually, Richard said, he bought about $35 worth of cocaine from two men, using some of his money and some

that Nicole had put toward the purchase. He made the drug buy, he claimed, because he felt sorry for Nicole. She consumed the cocaine, and he asked her if she still wanted to go to Freetown. Now she wanted to go back to Pioneer City. Nicole said she wanted more cocaine, and she resumed making "suggestive moves" and grabbed Richard's penis. This time, Richard got excited but told her he wasn't going to engage in any sex because he didn't "bring any protection."

Again, Richard said, they came across the two men who had sold him the drugs earlier. This time Adrian was there arguing with the men. Adrian got in, and the van pulled away. They drove for about five or ten minutes and stopped in a wooded area. They never found any more cocaine, and eventually Nicole asked to be let out at a school near Pioneer Village. There was no sexual activity other than Nicole's "suggestive moves" and the grab at his penis, according to Richard. He said Nicole was mad about not getting any additional drugs and told them that her boyfriend would be angry if he knew that she was using cocaine. Eventually Nicole got out near a school close to the spot where she had been picked up.

Adrian White testified that, after he swapped the video game he had just acquired for what he thought was cocaine but turned out to be ground macadamia nuts, he began arguing with the fraudulent vendors. During the argument, the white van driven by Richard returned. He got in, he said, and saw Nicole. Adrian described her as "more hyper than upset"; she said she wanted cocaine, but they could not give her any. They dropped her off at a school.

Defense counsel wanted to put a final witness on the stand, a man named Luther Moore. According to the proffer, "He is a witness who is familiar with [Nicole and the area], and he's going to testify that he has previous occasions when he has known that [Nicole] has asked people to provide cocaine in return for sex." When the State objected, citing the rape shield law, defense counsel told the court that the evidence was being offered under the excep-

tion covering evidence supporting a claim that the victim has an ulterior motive in accusing the defendant of a crime.

Defense counsel observed that the testimony's relation to sexual activity was "only peripheral in that she was going to provide her body in return for drugs." When the trial judge then asked whether Nicole had offered sex to Luther Moore, defense counsel expanded his proffer: "He's going to testify that he has had instances when she participated in sex with him for drugs." The judge sustained the prosecutor's objection.

The case was submitted to the jury, which found the Whites guilty of first and second degree rape, assault with intent to rape, assault, kidnapping, and theft. The trial court sentenced each of the Whites to life imprisonment for rape, one year consecutive for theft, and ten years consecutive for kidnapping. Convictions for the remaining charges were merged into the first degree rape convictions at sentencing. A three-judge panel later amended the sentences to make the ten years for kidnapping to run concurrently with the life sentences. The sole issue before us is the propriety of the trial court's refusal to admit the proffered defense testimony of Luther Moore.

Rape shield statutes have been enacted in a number of states throughout the country. One purpose of the statute is to protect rape victims from unscrupulous defense attorneys who try to shift the focus away from their clients and onto the victims.[1] *See Stephens v. Morris*, 756 F.Supp. 1137, 1142 (N.D.Ind.1991) ("The principal reason for the rape shield statutes is to shield victims of sex crimes from

---

**1.** These statutes are usually called "rape" shield laws, but in fact their scope includes a wider variety of sexual crimes. While Maryland's version is titled, "Admissibility of evidence in rape cases," it has a broader application. By its express language, the statute's protections extend to trials in which the crimes alleged are other types of prohibited sexual acts as well as rape. *See* Maryland Code (1957, 1987 Repl.Vol., 1991 Cum.Supp.), Article 27, §§ 461(e), 461A(a), 464(a), and 464A(a). *See also Lucado v. State*, 40 Md.App. 25, 29–30, 389 A.2d 398, 400–01 (1978). For simplicity's sake, however, we will continue to refer to our statute as a "rape" shield law.

general inquiry into their past sexual conduct and to keep these victims from feeling that they are on trial."); *Lucado v. State*, 40 Md.App. 25, 35–39, 389 A.2d 398, 404–06 (1978); Galvin, *Shielding Rape Victims in the State and Federal Courts: A Proposal for the Second Decade*, 70 Minn. L.Rev. 763, 791–98 (1986); *McCormick on Evidence*, § 193 at 573–74 (E. Cleary 3d ed. 1984); 5 L. McClain, *Maryland Evidence*, § 412.1 at 449–50 (1987).

Another reason to protect rape victims from harassment on the witness stand has been to encourage more victims to report the crimes and help bring rapists to justice. In analyzing its rape shield law, Mississippi's Supreme Court recently observed that the rule's purpose is

> "to prevent defense counsel from putting the victim 'on trial,' from unfairly invading the victim's privacy and from deflecting the jury's attention from the true issue. The rule reflects recognition that the trial process at best is traumatic to the victim of sexual abuse. If she has reason to believe the most intimate details of her life are going to be bandied about the courtroom, many victims will decide the game is not worth the candle and decline to file a complaint."

*Goodson v. State*, 566 So.2d 1142, 1149–50 (Miss.1990). *See also State v. Patnaude*, 140 Vt. 361, 438 A.2d 402, 407 (1981) ("The restrictions on the admissibility of certain evidence imposed by the rape victim shield law will encourage reluctant rape victims to come forward and report the crime, encourage these same victims to testify in court against their assailant, and produce more prosecutions and convictions, and thus be a greater deterrent."); *People v. Khan*, 80 Mich.App. 605, 264 N.W.2d 360, 364 (1978) (Before the enactment of Michigan's rape shield statute, "countless victims, already scarred by the emotional (and often physical) trauma of rape, refused to report the crime or testify for fear that the trial proceedings would veer from an impartial examination of the accused's conduct on the date in question and instead take on aspects of an inquisition in which complainant would be required to acknowledge and

justify her sexual past."); *Johnson v. State,* 146 Ga.App. 277, 246 S.E.2d 363, 365 (1978) ("[R]ape shield laws are intended generally to protect the complaining witness, thereby encouraging the reporting and prosecution of rapes...."); *Finney v. State,* 179 Ind.App. 316, 385 N.E.2d 477, 480 (1979) (A legitimate state policy for rape shield laws "is that they will aid in crime prevention because victims, knowing that the statute protects them from the embarrassment of the introduction of evidence of previous sexual activity, will be encouraged to report rape offenses."); V. Berger, *Man's Trial, Woman's Tribulation: Rape Cases in the Courtroom,* 77 Col.L.Rev. 1, 54 (1977) (In addition to protecting the victim's privacy and sparing her undue harassment, rape shield laws "encourage the victim to report the assault and assist in bringing the offender to justice by testifying against him in court. Insofar as the laws in fact increase the number of prosecutions, they support the government's aim of deterring would-be rapists as well as its interest in going after actual suspects." (Footnote omitted)).

In 1978 Congress enacted Fed.R.Evid. 412, which was intended to accomplish the same purposes as its state counterparts, particularly "to protect rape victims from the degrading and embarrassing disclosure of intimate details about their private lives." Statement of Representative Mann, quoted in 2 J. Weinstein and M. Berger, *Weinstein's Evidence,* at 412–5 (1989). Speaking for the proposed federal rule, Representative Holtzman said:

"Too often in this country victims of rape are humiliated and harassed when they report and prosecute the rape. Bullied and cross-examined about their prior sexual experiences, many find the trial almost as degrading as the rape itself. Since rape trials become inquisitions into the victim's morality, not trials of the defendant's innocence or guilt, it is not surprising that it is the least reported crime. It is estimated that as few as one in ten rapes is ever reported."

*Quoted in 2 Weinstein's Evidence,* at 412–6. *See United States v. Cardinal,* 782 F.2d 34, 36 (6th Cir.1986), *cert. denied,* 476 U.S. 1161, 106 S.Ct. 2282, 90 L.Ed.2d 724 (1986).

The General Assembly originally enacted Maryland's statute in 1976 as part of a major revision of the state's sex offense laws.[2] In its report on the rape shield bill, the Senate Judicial Proceedings Committee said that it

> "took cognizance of the broad based support of the concept of limiting evidence relating to prior sexual conduct of a rape victim and that such a limitation would probably result in an increase in the percentage of rapes reported; that a statutory response to the inherent sensitivities of a traumatized victim could accommodate the constitutionally mandated rights and protections properly afforded a defendant in our criminal justice system; and that the weighing of inflammatory nature *versus* the probative value of evidence of specific instances of prior sexual conduct precludes possible admission of highly prejudicial evidence of limited probative value. Presently, it is the practice of some courts to admit evidence of any probative value irrespective of its inflammatory nature."

Report of Senate Judicial Proceedings Committee on Senate Bill No. 399 at 4.

■ The statute, however, is not inflexible. The exceptions written into the law provide ways for a defendant to bring up a victim's conduct when necessary to the defense. The Whites argue that Luther Moore's testimony about Nicole's prior sexual conduct fits the third exception to the rape shield statute, which permits evidence of prior sexual conduct if it "supports a claim that the victim has an ulterior motive in accusing the defendant of the crime." In order for them to succeed in getting that evidence to the jury, however, they must convince the trial judge first that

---

**2.** For a discussion of the legislative history, *see Lucado v. State,* 40 Md.App. at 29–32, 389 A.2d at 400–02. *See also* Pitcher, *Rape and Other Sexual Offense Law Reform in Maryland, 1976–1977,* 7 Balt. L.Rev. 151–70 (1977), and the interim report of the Special Legislative Committee on Rape and Related Offenses (1977).

it "is relevant and is material to a fact in issue," and second "that its inflammatory or prejudicial nature does not outweigh its probative value." Art. 27, § 461A(a). A trial court's determination on relevance will not be reversed by an appellate court absent a clear showing that it abused its discretion. *Thomas v. State,* 301 Md. 294, 317, 483 A.2d 6, 18 (1984), *cert. denied,* 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985). *See also State v. Allewalt,* 308 Md. 89, 101–02, 517 A.2d 741, 747 (1986).

■ The Whites proffered that Luther Moore's testimony would establish Nicole's motives to make a false complaint of rape. Their first contention is that Nicole may have falsely accused them of rape because she was angry that they had not obtained more cocaine for her. Her anger was the result of their failure to procure drugs, not their failure to trade drugs for sex. Even adopting the Whites' contention, it was not their declining Nicole's offer of sex that motivated the false charge; it was their declining her request for drugs. Any prior sexual acts or prior sexual solicitations by Nicole could have little, if any, relevance to her alleged anger at the Whites. In addition, the fact that Nicole may have successfully offered or traded sex for drugs in the past does not tend to show that she would become enraged with the Whites for failing to supply her with drugs and declining her alleged sexual solicitation. Luther Moore's testimony would have dubious relevance to establishing that Nicole had an ulterior motive to lie, whereas its prejudice to Nicole and the State would be extreme.

■ The Whites also allege that Nicole might have fabricated a rape story so that her fiancé would not get mad because she had been out smoking cocaine with two men. Luther Moore's proffered testimony provides no support for this contention. Whether Nicole may have smoked cocaine in the past is irrelevant to any alleged fear of her fiancé's reaction if he ever found out that she had been smoking cocaine. In fact, Luther Moore's proposed testimony seems to run counter to this part of the Whites' argument, since

the proffer contains the claim that Nicole had consumed cocaine in the past without reference to any fear she had of her fiancé's reaction.[3] Proffered evidence of past sexual conduct must contain a direct link to the facts at issue in a particular case before it can be admitted. Other courts have given some guidance for the instant case. *See, e.g., Hall v. State,* 500 So.2d 1282, 1285–86 (Ala.Crim.App.1986) (Defense wanted to offer evidence that victim and her boyfriend had a sexual relationship in order to show that victim had a motive to fabricate the rape and justify her late return to her boyfriend; court held that such evidence is barred by rape shield statute); *Com. v. Folino,* 293 Pa.Super. 347, 439 A.2d 145, 149–50 (1981) (Statement of teenage, runaway victim to police officer a week after assault that she was "living with" truck driver did not show plan to engage in sex as means of support and was not admissible; also proffered evidence that victim approached another man prior to defendant and offered to engage in sex with him barred by rape shield statute despite defense claim that it would show a continuing course of conduct).

What Luther Moore's testimony would do is paint a picture of the victim as an immoral person who sells herself for illegal drugs. In that manner, the Whites might refocus the trial on Nicole's character, one of the results that the rape shield statute is meant to guard against. Even if we were to assume that the proffered testimony may have had some relevancy, albeit minimal, the trial judge may exclude it under § 461A if its inflammatory or prejudicial nature outweighs its probative value, having due regard for the defendant's right of confrontation, right to present an effective defense and right to due process. *Thomas v. State,* 301 Md. at 318–19, 483 A.2d at 18–19; Annotation 1 A.L.R.4th 283 (1980). The testimony in ques-

---

3. Petitioners wisely abandon the argument they raised before the trial court that Moore would refute Nicole's testimony that she did not take drugs. As the prosecutor noted, and the trial transcript shows, Nicole testified merely that she had *told* the strangers in the van she did not use drugs.

tion would have invited the jurors to stray into collateral matters that would have obscured the issues before them. Its probative value, if any, was far outweighed by its prejudicial effect. *Lyba v. State*, 321 Md. 564, 570–71, 583 A.2d 1033, 1036 (1991); *Smallwood v. State*, 320 Md. 300, 307–08, 577 A.2d 356, 359 (1990); *State v. Cox*, 298 Md. 173, 178, 468 A.2d 319, 321 (1983).

■ The Whites contend that the trial judge failed to balance the inflammatory nature of the proffered evidence against its probative value. They are wrong. The transcript of the bench conference reveals that, as the prosecutor and defense lawyer started sparring over the proffer, the judge read the rape shield statute twice. The second time, he specifically read out loud the section calling for him to balance the probative value of the evidence against its potential for prejudice. After that, the two lawyers continued to debate before the trial court ruled. It is apparent to us that the judge acted according to his responsibilities as outlined in the statute.

■ An additional reason for rejecting the proffer of Luther Moore's testimony exists independent of the rape shield statute. A trial judge has discretion in determining whether evidence is relevant to bias or motive. As we have already indicated, Nicole's alleged bias against the Whites was because they failed to supply her with drugs, not because they failed to have sexual relations with her. Even if she had exchanged sexual favors for drugs in the past, it would not necessarily indicate that she would become enraged and vindictive if someone were unable or unwilling to trade drugs for sex. In fact, nothing in the proffer is at odds with Nicole's version of what happened. Wide latitude must be given to a criminal defendant to establish bias or motive of a witness. *Smallwood v. State*, 320 Md. at 307–08, 577 A.2d at 359. The trial judge, however, still has discretion in determining whether particular evidence is relevant to the issue of bias or motive. *See McCormick on Evidence*, § 40, which states: "The trial court has a great

deal of discretion in deciding whether particular evidence indicates bias and prejudice." *Id.* at 87.

■ The Whites also contend before this Court that the ruling deprived them of their constitutional right to present witnesses in their defense. This argument was not made to the trial court and thus is not properly before us. Maryland Rule 8–131(a); *Henry v. State,* 273 Md. 131, 139, 328 A.2d 293, 299 (1974).

■ Even if the issue had been preserved for appellate review, we find no violation of the Whites' constitutional rights. The United States Supreme Court recently upheld a notice requirement in Michigan's rape shield law. In doing so, the Court reiterated the principle that " 'trial judges retain wide latitude' to limit reasonably a criminal defendant's right to cross-examine a witness 'based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' " *Michigan v. Lucas,* 500 U.S. ——, ——, 111 S.Ct. 1743, 1746, 114 L.Ed.2d 205, 212 (1991), quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). The Court noted that the Michigan law "represents a valid legislative determination that rape victims deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy." 500 U.S. at ——, 111 S.Ct. at 1746, 114 L.Ed.2d at 212.

Of course, the state's interest in excluding evidence must at times yield to a defendant's due process right to present a defense and 6th Amendment right to confront witnesses, especially where the proffered testimony has a direct link to the defendant or establishes a possible motive for the witness to implicate the defendant in a crime. But with this in mind, the trial court in the proper exercise of discretion may exclude evidence under Art. 27, § 461A without offending a defendant's constitutional rights of confrontation and due process. *Thomas v. State,* 301 Md. at 318–19, 483 A.2d at 18–19.

We hold that the trial judge did not abuse his discretion in excluding the proffered evidence. We therefore affirm the judgment of the Court of Special Appeals.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONERS.